UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



FILED

SEP 2 5 2017

CLERK

| | |
|---|---|
| MARTIN T. RAML,<br><br>Plaintiff,<br><br>vs.<br><br>DONALD J. RAML,<br><br>Defendant. | 4:15-CV-04154-RAL<br><br><br>ORDER GRANTING MOTION FOR<br>SUMMARY JUDGMENT |

Plaintiff Martin Raml (Martin) and Defendant Donald Raml (Don)[1] are brothers who were also business partners in a South Dakota limited liability company called Lake Area Apartments (LAA). Don obtained complete ownership of LAA in 2010 as confirmed through a declaratory judgment action. When Martin filed for bankruptcy less than a year later, he was aware of his potential claims against Don concerning LAA but he failed to disclose those claims to the bankruptcy court. Judicial estoppel bars Martin from asserting those claims now in this case.

## I.     Facts

Martin is a real estate broker in Arizona and Don is a certified public accountant in Watertown, South Dakota. Doc. 40 at ¶¶ 4, 5; Doc. 43 at ¶¶ 4, 5. LAA was a member-managed company, with Don acting as LAA's "Designated Member." Doc. 46-3 at 5; Doc. 45-1 at 5; AUF[2] at ¶ 2; Doc. 48 at ¶ 2. Martin initially owned 50% of LAA while RVHL, a corporation comprised of Don and his three accounting partners, initially owned the other 50%. Doc. 40 at ¶ 2; Doc. 43 at ¶ 2;

---

[1]Both parties refer to Donald as "Don" so this Opinion and Order does so as well.
[2]Martin included a list of "Additional Undisputed Facts" in the same document as his response to Don's statements of undisputed material facts. For clarity, citations to Martin's Additional Undisputed Facts will be preceded by "AUF."

Doc. 1 at ¶ 15; Doc. 44 at 2. Martin and RVHL each invested $500 of capital in LAA when the company was formed in May 2000. Doc. 40 at ¶¶ 1, 3; Doc. 43 at ¶¶ 1, 3. The parties also executed a contract "for the purpose of establishing a Buy/Sell Agreements [sic] and of setting forth the terms under which the members in [LAA] shall sell their respective share of [LAA] upon withdrawal from [LAA]." Doc. 42-1 at 19; Doc. 46-4 at 1. As relevant here, the Buy/Sell Agreement provided:

> The members desire a smooth transition upon the withdrawal or death of a member, and, accordingly, set the following parameters to be binding upon one of the events aforementioned:
> . . . .
> 2) It is agreed that RVHL, Inc., from its share of distribution proceeds will pay Martin Raml $75,000 plus accumulated interest at a rate of 8% from the date of closing. RVHL, Inc., will be paid for any accrued management fees prior to any member distributions and payment to Martin Raml for the aforementioned $75,000 and accumulated interest. Upon dissolution of the corporation, or upon Martin's death, if there are not enough assets after the debt service is retired and all other creditors are paid, Martin will not be liable to RVHL, Inc., for any unpaid management fees, likewise RVHL, Inc. will not be liable to Martin for the aforementioned $75,000.

Doc. 42-1 at 19; 46-4 at 1.

In May 2000, LAA purchased two apartment buildings in Watertown from companies in which Martin was a partner. Doc. 40 at ¶ 6; Doc. 43 at ¶ 6. According to Martin, he had $150,000 of equity in the apartments at the time LAA purchased them, and the $75,000 discussed in the Buy/Sell Agreement was meant "to balance out the equity/capital invested by the members at the startup of LAA." Doc. 46 at ¶ 8; see also Doc. 40 at ¶ 11; Doc. 43 at ¶ 11.

Martin was paid $75,000 in 2003. Doc. 43 at ¶ 13; Doc. 43 at ¶ 13; Doc. 42-2 at 44. He contends that Don paid him this $75,000 from an LAA distribution rather than from RVHL's own share of distribution as Martin believes the contract required. Doc. 43 at ¶ 13; Doc. 46 at ¶ 7. Martin believes that because he owned 50% of LAA, RVHL really only paid him half of the $75,000. Martin also contends that the $75,000 payment burdened the apartments and the cash flow therefrom

because Don and his partners, without Martin's approval, paid Martin by borrowing $50,000 against the apartment and taking the other $25,000 from operating reserves. Doc. 46 at ¶ 8.

In late 2005, RVHL decided to get out of the apartment business and to sell its shares of LAA. Doc. 40 at ¶ 14; Doc. 43 at ¶ 14; Doc. 42-2 at 23–25. According to Don, LAA's local bank wanted him to have an "ownership presence" in LAA before the bank would finance the buyout of RVHL. Doc. 40 at ¶ 15; Doc. 43 at ¶ 15; Doc. 45-1 at 11–12. In December 2005, the parties entered into a contract for the buyout of RVHL. Doc. 40 at ¶ 16; Doc. 43 at ¶ 16; Doc. 42-2 at 23–25. Under the contract, Martin agreed that Don would become a member of LAA while RVHL would withdraw. Doc. 40 at ¶ 18; Doc. 43 at ¶ 18; Doc. 42-2 at 23. Martin would own 75% of the company and Don would own 25%, but Martin would receive 100% of LAA's profits and losses. Doc. 40 at ¶ 19; Doc. 43 at ¶ 19; Doc. 42-2 at 24. The contract also provided that on or before January 1, 2007, Martin would purchase Don's interest in LAA for $5,000 and Don would then be deemed to have withdrawn from LAA. Doc. 40 at ¶¶ 20–21; Doc. 43 at ¶¶ 20–21; Doc. 42-2 at 25. If Martin failed to purchase Don's interest by the January 1, 2007 deadline, however, Don's share of profits and losses in LAA would increase to 25% while Martin's would decrease to 75%. Doc. 40 at ¶ 21; Doc. 43 at ¶ 21; Doc. 42-2 at 25. The buyout of RVHL occurred in 2006, with RVHL receiving $214,200 for its 50% interest in LAA. Doc. 40 at ¶ 16; Doc. 43 at ¶ 16. To finance the buyout, Martin and Don signed a mortgage on behalf of LAA in favor of Dacotah Bank on March 29, 2006. Doc. 46-6 at 16; Doc. 45-1 at 14–15; AUF at ¶ 15; Doc. 48 at ¶ 15. Don was not in Arizona when the mortgage was signed, although the notary block on the mortgage states that Don and Martin personally appeared before the notary in Arizona at the time of signing. AUF at ¶ 16; Doc. 48 at ¶ 16; Doc. 46-6 at 16. Martin failed to pay Don the $5,000 by January 1, 2007, and in fact has never done so. Doc. 40 at ¶ 22; Doc. 43 at ¶ 22.

The 2008 financial crisis caused serious problems for Martin's real estate investments in Arizona. Doc. 40 at ¶ 23; Doc. 43 at ¶ 23. In hopes of recovering, Martin wanted to buy other

properties while prices were low; he believed he owned 100% of LAA and therefore had "plenty of equity" to support these purchases. Doc. 40 at ¶ 24; Doc. 43 at ¶ 24. Although Don advised against it, Martin decided to pledge equity in LAA as security for a promissory note with Merlin Jeitz. Doc. 40 at ¶¶ 25–28; Doc. 43 at ¶¶ 25–28; Doc. 42-2 at 10–11, 29–31. Martin apparently borrowed $25,000 from Jeitz on February 11, 2009, pledging $250,000 of equity in LAA as security.[3] Doc. 40 at ¶¶ 27–28; Doc. 43 at ¶¶ 27–28; Doc. 42-2 at 29–31.

In emails sent in March and August of 2009, Martin assured Don that Jeitz would be paid. Doc. 42-2 at 41–42. As of February 2017, however, Martin estimates that he has only paid Jeitz $12,317 of the $25,000, plus interest, he owes him. Doc. 40 at ¶ 32; Doc. 43 at ¶ 32.

The $25,000 loan from Jeitz did not solve Martin's financial difficulties. He asked Don for money from LAA several times in 2009, intending to use this money to avoid defaulting on his Arizona properties. Doc. 40 at ¶¶ 33, 35; Doc. 43 at ¶¶ 33, 35; Doc. 42-2 at 13–14; Doc. 42-4 at 3–8; Doc. 42-5 at 1. In March 2009, Martin sought $100,000 from LAA, asking Don to borrow this amount from the bank. Doc. 40 at ¶¶ 38–39; Doc. 43 at ¶¶ 38–39. Don agreed to do so, but wanted more control over LAA if he was going to guarantee another loan to the company. Doc. 40 at ¶ 40; Doc. 43 at ¶ 40. Thus, Don and Martin negotiated and entered into a written agreement dated March 10, 2009 (2009 Agreement). Doc. 40 at ¶¶ 42–44; Doc. 43 at ¶¶ 42–44; Doc. 42-2 at 45–46; Doc. 46-7 at 1–2.

Under the 2009 Agreement, Martin would receive $100,000 that LAA would borrow from the bank and Don would personally guarantee that loan. Doc. 42-2 at 45. In exchange for Don guaranteeing the $100,000 loan, Martin agreed that unless he met four conditions "on or before

---

[3]Martin's submissions explained that although the security agreement was for $250,000, he only borrowed $25,000 from Jeitz, so this amount was the total equity of LAA subject to being pledged as security. Doc. 43 at ¶ 28; Doc. 46 at ¶ 17. Had he borrowed more money from others, according to Martin, the security agreement would have been used to secure a maximum amount of $250,000. Doc. 43 at ¶ 28; Doc. 46 at ¶ 17.

12/15/09," he would "transfer his entire equity rights of ownership in [LAA] to Donald for no additional consideration." Doc. 42-2 at 45. The four conditions Martin agreed to meet were:

> 1) securing alternate financing to relieve Don of his personal guarantees on LAA's debt obligations;
> 2) paying Don $30,000 in guarantor fees generated for guaranteeing LAA's obligations since 2006;
> 3) paying Jody Raml, Don's wife, $500 per month for administrative duties and $275 per month for cleaning the properties; and
> 4) buying out Don's equity interest in LAA for a price of the payoff of all the mortgaged debt and releasing Don from all personal liability.

Doc. 42-2 at 45. The 2009 Agreement also provided that Jeitz's $25,000 loan to Martin was not an obligation of LAA and that Martin would pay Jeitz from the $100,000 he was borrowing from LAA. Doc. 40 at ¶¶ 45–46; Doc. 43 at ¶¶ 45–46; Doc. 42-2 at 46.[4]

In September 2009, Don emailed Martin offering to purchase Martin's interest in LAA. Doc. 40 at ¶ 54; Doc. 43 at ¶ 54; Doc. 42-1 at 5; Doc. 47-2 at 4; Doc. 42-4 at 6. Don testified that Martin needed more money and had asked Don to put together a buyout proposal. Doc. 42-1 at 5; Doc. 47-2 at 4. Don stated in the email that the offer did "not change the current agreement between us which is in force and is to come due at the end of 2009." Doc. 42-4 at 6.

The parties dispute whether Don ever extended the December 15, 2009 deadline. In an October 6, 2009 email to Martin, Don wrote that he had decided "to stick to our original agreement which matures on December 31, 2009."[5] Doc. 42-2 at 47; Doc. 40 at ¶ 56; Doc. 43 at ¶ 56. On December 10, 2009, Don wrote Martin an email saying that Don had "decided not to extend." Doc. 42-2 at 48; Doc. 40 at ¶ 56; Doc. 43 at ¶ 56. Don testified that he never extended the December 15, 2009 deadline, either orally or in writing. Doc. 40 at ¶ 58; Doc. 43 at ¶ 58; Doc. 42-1 at 8–9. Don said that his reasons for refusing to extend the deadline included Martin's divorce, Martin failing to

---

[4]Martin failed to pay off the Jeitz loan. Doc. 40 at ¶ 32; Doc. 43 at ¶ 32.
[5]The deadline in the 2009 Agreement was actually December 15, 2009. Martin testified that he knew that December 15, 2009 was the deadline based on signing the 2009 Agreement. Doc. 42-2 at 15.

repay Jeitz, Martin's continual need for money, and Martin's harassment of family members. Doc. 42-1 at 9. Don points to emails from Martin in December 2009 requesting an extension to show that Don never actually extended the deadline as Martin alleges. Doc. 42-4 at 14–18. Martin testified that Don orally agreed to extend the December 15, 2009 deadline. Doc. 42-2 at 17–18; Doc. 40 at ¶ 55; Doc. 43 at ¶ 55. He asserts in an affidavit that Don agreed to extend the deadline during telephone conversations around Halloween and Thanksgiving of 2009. Doc. 46 at ¶ 22. Martin agrees, however, that there are no documents supporting his claim that Don agreed to extend the December 15, 2009 deadline. Doc. 42-2 at 18; Doc. 40 at ¶¶ 55, 57; Doc. 43 at ¶¶ 55, 57.

The parties also dispute to some degree whether Martin satisfied any of the four conditions that the 2009 Agreement required him to meet by December 15, 2009, to avoid transfer of his interest in LAA to Don. Don maintains that Martin failed to secure alternate financing to relieve Don of his personal guarantees on LAA's debt obligations, failed to pay Don $30,000 in guarantor fees, and failed to buy out Don's equity interest in LAA "for a price of the payoff of all the mortgaged debt and release of [Don] from all personal liability." Doc. 40 at ¶¶ 50–53. During his deposition, Martin testified that he had not secured alternate financing to relieve Don of his personal obligations or bought out Don's equity interest by the December 15, 2009 deadline. Doc. 42-2 at 15–16. Martin said that although he did not pay Don the $30,000 in guarantor fees, he assumed that Don would withdraw this money from LAA as Don had done to pay Jody Raml for her administrative and cleaning work. Doc. 42-2 at 15–16; Doc. 40 at ¶ 52; Doc. 43 at ¶ 53.

Martin argues that it was impossible for him to buy out Don's equity interest in LAA because Don never told him what the buyout price was. AUF at ¶¶ 39–40; Doc. 48 at ¶¶ 39–40; Doc. 44 at 4; Doc. 46 at ¶ 16. Don testified during his deposition that he did not know the buyout price and could not remember if he ever told Martin the amount of the price. Doc. 45-1 at 17; AUF at ¶¶ 19–20; Doc. 48 at ¶¶ 19–20. Martin also asserts that Don "ignored a written offer" for the purchase of his

interest in LAA, citing as support a December 15, 2009 email Martin sent to Don. Doc. 46 at ¶ 16; AUF at ¶¶ 36–38; Doc. 48 at ¶¶ 36–38. In the December 15, 2009 email, Martin wrote:

> I have several people lined up to take you off the loan.
> Dennis Breske, commercial broker, CCIM Sioux Falls SD.
> Curt Johnson is reviewing it, local resident with connections and financial strength.
> Cheryl Masciarelli and her family.
> Ron Nelsen, substantial business owner from Ohio.
> There is offer [sic] sitting on your desk for acquisition and removal of you as a partner.
> Please sign it.
> Mary Jo is very interest [sic] but needs more time due to family matters.
> Let's get moving. I am worried about your lack of communication and actions.

Doc. 46-10. When asked about the offer Martin referenced in the email, Don testified that he had received "an offer for a contract for deed or some type of negotiation of some sort," but that he had not responded to this offer or the December 15, 2009 email. Doc. 45-1 at 22; Doc. 43 at ¶¶ 36–38; Doc. 48 at ¶¶ 36–38. Don testified that by that point, the only offer he was willing to accept was "[b]asically just the conditions that were on our" 2009 Agreement. Doc. 45-1 at 22.

On December 18, 2009, Thomas J. Linngren, an attorney with the firm of Green Roby Oviatt LLP (GRO), emailed Martin a notice stating that Martin had failed to meet the conditions of the 2009 Agreement.[6] Doc. 42-2 at 49. Linngren wrote that Martin had ten days to respond to the notice, explaining that a failure to do so would cause Martin's interest in LAA to transfer to Don. Doc. 42-2 at 49. Martin never responded. Doc. 40 at ¶ 62; Doc. 43 at ¶ 62. Martin asserts in an affidavit that

---

[6]The 2009 Agreement provided that if Martin failed to meet the four conditions,

> Donald may give written notice (email shall be deemed sufficient) of that fact to Martin anytime after 12/15/09. Unless, within 10 days after Donald's delivery of said notice, Martin disputes Donald's claim that one or more of the conditions have not been met, then the transfer of Martin's entire equity interest in [LAA] to Donald shall be immediate [sic] complete by operation of law, without the necessity of any further execution or deliver [sic] of a bill of sale or similar documentation, and [LAA's] books and records shall be immediately modified to reflect the same.

Doc. 42-2 at 45–46.

7

he believed that Linngren "was still working" for LAA when he sent the notice. Doc. 46 at ¶ 25. GRO had represented LAA from time to time since 2000. Doc. 45-2 at ¶ 4; Doc. 45-1 at 10; AUF at ¶ 10; Doc. 48 at ¶ 10. Don was GRO's contact person on behalf of LAA, and GRO did not represent Martin during the relevant time period. Doc. 45-2 at ¶¶ 4, 7. Don hired GRO to send Martin the December 18, 2009 notice. Doc. 45-2 at ¶ 5; Doc. 45-1 at 21; AUF at ¶ 31; Doc. 48 at ¶ 31.

In 2010, Don, through GRO, commenced a declaratory judgment action against Martin in South Dakota state court. Doc. 45-2 at ¶ 5; Doc. 40 at ¶ 65; Doc. 43 at ¶ 65. On March 19, 2010, Don sent a package to Martin's P.O. box via certified mail. Doc. 40 at ¶ 73; Doc. 43 at ¶ 73. This package included Martin's 2009 LAA tax forms, which Don had prepared as LAA's accountant, and the declaratory judgment complaint. Doc. 40 at ¶ 73; Doc. 43 at ¶ 73; AUF at ¶ 42; Doc. 48 at ¶ 42; Doc. 45-1 at 24. Martin's business associate signed for the package on April 7, 2010. Doc. 40 at ¶ 75; Doc. 43 at ¶ 75. Don sent an identical package of documents to Martin's daughter, Angela Eliason, along with a note asking her to deliver the package to Martin. Doc. 40 at ¶¶ 77, 79; Doc. 43 at ¶¶ 77, 79. Martin's daughter received the package sometime in March 2010, and she delivered it to Martin a few days later. Doc. 41 at ¶ 5; Doc. 40 at ¶ 80; Doc. 43 at ¶ 80.

On May 7, 2010, Don executed an Affidavit in Support of Order for Service of Summons by Publication; he filed the declaratory judgment complaint on May 10, 2010. Doc. 42-6 at 22–24; Doc. 40 at ¶¶ 66–67; Doc. 43 at ¶¶ 66–67. The complaint sought a "declaration that the entire equity interest in [LAA] is now owned by the Plaintiff [Don], and the Defendant [Martin] is barred from claiming any further interest of any kind therein." Doc. 42-6 at 24. On the same day Don filed the complaint, the state court judge entered an order for service of summons by publication in a newspaper in Codington County, South Dakota. Doc. 42-6 at 21; Doc. 40 at ¶ 68; Doc. 43 at ¶ 68. The state judge also ordered that Don mail copies of the summons and complaint to Martin at his last known address. Doc. 42-6 at 21; Doc. 40 at ¶ 68; Doc. 43 at ¶ 68. Three days later, Linngren mailed

to Martin at his last known address a copy of the summons and the state judge's order for service of summons by publication. Doc. 40 at ¶ 69; Doc. 43 at ¶ 69. The summons was published for four consecutive weeks in the Watertown Public Opinion. Doc. 40 at ¶ 70; Doc. 43 at ¶ 70. In June 2010, Martin called Don's office advising that he was hiring attorneys to sue Don. Doc. 40 at ¶ 82; Doc. 43 at ¶ 82.

On July 9, 2010, the state judge entered declaratory judgment by default against Martin. Doc. 40 at ¶ 71; Doc. 43 at ¶ 71; Doc. 42-6 at 14–15. The declaratory judgment stated that "the entire equity interest in [LAA] is now owned by the Plaintiff [Don], and the Defendant [Martin] is barred from claiming any further interest of any kind therein." Doc. 42-6 at 14–15. On that same day, Linngren mailed copies of the declaratory judgment and the notice of entry to Martin's last known address. Doc. 40 at ¶ 72; Doc. 43 at ¶ 72. Despite Linngren and Don's mailings, delivery by Martin's daughter to him of the declaratory judgment complaint, Martin's June 2010 statement about hiring a lawyer to sue Don, and publication of the summons, Martin testified that he first learned of the declaratory judgment action in August 2010 when he was in Watertown for a wedding. Doc. 40 at ¶ 81; Doc. 43 at ¶ 81.

Don testified that it was possible that LAA, rather than Don himself, paid GRO for its work on the December 18, 2009 notice and the declaratory judgment action. Doc. 45-1 at 22; AUF at ¶ 34; Doc. 48 at ¶ 34. Although the declaratory judgment order established that Don owned all of LAA, Martin remained as a guarantor on some of LAA's debt until Don refinanced the debt approximately two or three years later. Doc. 45-1 at 26; AUF at ¶ 43; Doc. 48 at ¶ 43.

In April 2011, Martin filed a voluntary petition for Chapter 7 bankruptcy. Doc. 40 at ¶ 88; Doc. 43 at ¶ 88. Martin did not list his claimed interest in LAA or potential claims against Don as assets on his original or amended bankruptcy schedules. Doc. 40 at ¶ 89; Doc. 43 at ¶ 89. On his Schedule B concerning personal property, Martin checked "none" as to item 21, which asked Martin

to disclose "[o]ther contingent and unliquidated claims of every nature." Doc. 42-8 at 8.[7] Martin did list Don and LAA as creditors holding an unsecured, nonpriority claim, however. Doc. 40 at ¶ 90; Doc. 43 at ¶ 90. Martin also listed the declaratory judgment action on his amended statement of financial affairs, which stated "Debtor was sued by co-owner and brother, Donald Raml, and [w]as removed by judgment in July 2010." Doc. 40 at ¶ 92; Doc. 43 at ¶ 92; Doc. 42-8 at 50. As part of an adversary proceeding in his bankruptcy case, Martin gave a deposition in which he admitted to having lost LAA to Don. Doc. 40 at ¶¶ 93–95; Doc. 43 at ¶¶ 93–95. Martin testified that he did not know why Don brought the declaratory judgment action since Martin's interest in LAA had already been extinguished by that point. Doc. 40 at ¶ 95; Doc. 43 at ¶ 95. When answering the complaint in the adversary proceeding, Martin "affirmatively allege[d]" that he lost his interest in LAA on December 15, 2009. Doc. 40 at ¶ 96; Doc. 43 at ¶ 96; Doc. 42-9 at 9. Martin received a discharge in January 2013 without LAA or any of its equity or any of Martin's prospective claims against Don being brought into the bankruptcy proceeding or treated as a preferential transfer. Doc. 40 at ¶¶ 99– 100; Doc. 43 at ¶¶ 99–100.

Martin sued Don in this Court in October 2015. Doc. 1. Martin asserted claims for breach of the duty of good faith and fair dealing; negligent performance of accounting services; negligent misrepresentation; breach of fiduciary duty; fraudulent inducement or deceit; unjust enrichment; constructive trust; and punitive damages. Doc. 1. Don moved for summary judgment, Doc. 38, arguing that Martin's claims are barred by res judicata, judicial estoppel, and the statute of limitations.

## II.  Summary Judgment Standard

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[7]In his amended Schedule B, Martin listed "unclaimed funds from state of AZ" under item 21 but did not list any other claims. Doc. 42-8 at 58.

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). On summary judgment, the facts and inferences drawn from those facts must be viewed in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curium). Undisputed facts must be presented by citing to materials in the record, including depositions, affidavits, and other sworn or certified evidence, and the parties usually cannot rely on the pleadings alone. Fed. R. Civ. P. 56(c)(1), (e); Celotex Corp., 477 U.S. at 324. "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (quoting Krenik v. Cty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995)). "A mere scintilla of evidence is insufficient to avoid summary judgment;" the evidence must be "significantly probative" in establishing a genuine issue of material fact to avoid summary judgment. Moody v. St. Charles Cty., 23 F.3d 1410, 1412 (8th Cir. 1994).

## III.  Analysis

Don argues that judicial estoppel applies to Martin's claims because Martin failed to disclose them in his bankruptcy. South Dakota law governs whether judicial estoppel applies in this diversity case. Spencer v. Annett Holdings, Inc., 757 F.3d 790, 797 (8th Cir. 2014). Judicial estoppel is an equitable doctrine that prevents a party from taking inconsistent positions in different legal proceedings. Van Horn v. Martin, 812 F.3d 1180, 1182 (8th Cir. 2016); Watertown Concrete Prods. v. Foster ex rel. Estate of Foster, 630 N.W.2d 108, 112 (S.D. 2001). Courts in South Dakota generally consider three non-exhaustive factors when deciding whether to apply judicial estoppel: (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) whether the party

persuaded the first court to accept its position, "creating the risk of inconsistent legal determinations"; and (3) whether the party asserting an inconsistent position "would derive an unfair advantage or impose an unfair detriment to the opponent if not estopped." Watertown Concrete Prods., 630 N.W.2d at 112; see also Van Horn, 812 F.3d at 1182 (listing same elements).

## A. Inconsistent positions

When a debtor files a Chapter 7 petition for bankruptcy, all of his assets, including causes of action that accrued prepetition, become property of the bankruptcy estate. 11 U.S.C. § 541(a)(1); Combs v. The Cordish Cos., 862 F.3d 671, 679 (8th Cir. 2017). A debtor has a duty to disclose his assets in the schedules he files with the bankruptcy court. 11 U.S.C. § 521(a)(1); Bauer v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003). Because the bankruptcy court and other interested parties rely on these disclosures, it is critical that the "debtor's bankruptcy schedules and statement of affairs be as accurate as possible." Browning Mfg. v. Mims (In re Coastal Plains, Inc.), 179 F.3d 197, 208 (5th Cir. 1999). A debtor's duty to disclose is broad, and includes potential causes of action. E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 680 (8th Cir. 2012); Guay v. Burack, 677 F.3d 10, 17 (1st Cir. 2012); Eastman v. Union Pac. R.R. Co., 493 F.3d 1151, 1159 (10th Cir. 2007). When a debtor files for bankruptcy and fails to disclose a cause of action, he may be judicially estopped from asserting that cause of action in a later case. Stallings v. Hussman Corp., 447 F.3d 1041, 1047 (8th Cir. 2006); Foster v. Foster, 673 N.W.2d 667, 672–73 (S.D. 2003) (holding that judicial estoppel applied to plaintiff who had failed to disclose his breach of contract claim in bankruptcy case).

A cause of action accrues prepetition, and is thus property of the bankruptcy estate, if "all of the elements of the cause of action had occurred as of the time that the bankruptcy case was commenced." Harms v. Cigna Ins. Cos., 421 F. Supp. 2d 1225, 1229 (D.S.D. 2006) (quoting Wooten v. Althama Bank & Tr., No. Civ.A. CV203-100, 2005 WL 2459095, at *2 (S.D. Ga. Oct. 4, 2005)).

Here, all of the elements of Martin's claims would have occurred[8] well before he filed for bankruptcy in April 2011. Martin's claims were therefore part of his bankruptcy estate and he should have disclosed them on his bankruptcy schedules. When Martin checked "none" on his Schedule B when asked to disclose "contingent and unliquidated claims of every nature," he represented to the bankruptcy court that he did not have any claims against Don. <u>Stallings</u>, 447 F.3d at 1047 ("A debtor's failure to list a claim in the mandatory bankruptcy filings is tantamount to a representation that no such claim existed." (citation and internal quotation marks omitted)). Martin's position in this case—that he has claims against Don entitling him to over $1.5 million—is thus clearly inconsistent with his position in bankruptcy court.

### B. Judicial Acceptance

Courts have found that a bankruptcy court accepts a debtor's position when the debtor fails to disclose a cause of action and the bankruptcy court discharges the debtor's unsecured debts based on the information the debtor provided. <u>Van Horn</u>, 812 F.3d at 1183; <u>Jones v. Bob Evans Farms, Inc.</u>, 811 F.3d 1030, 1033 (8th Cir. 2016). Here, Martin represented that he had no claims against Don, and the bankruptcy court accepted this position when it discharged $1,866,649.08 of Martin's debt in January 2013. Doc. 40 at ¶ 100; Doc. 43 at ¶ 100. The second factor of judicial estoppel is satisfied under these circumstances. See <u>EEOC v. Merchants State Bank</u>, 554 F. Supp. 2d 959, 965 (D.S.D. 2008) (holding that the bankruptcy court had accepted the debtor's position when the debtor failed to disclose his ADA claim on his bankruptcy schedule and the bankruptcy court discharged his debts).

### C. Unfair Advantage

When Martin filed this lawsuit after failing to disclose it in his bankruptcy, he created a situation where he theoretically could recover over a million dollars of damages and then keep it all for himself. Had Martin disclosed his claims, the trustee of his bankruptcy estate could have pursued

---

[8]Nothing in this Opinion and Order is meant to suggest that Martin had valid or viable claims against Don. This Court is simply taking the facts in the light most favorable to the non-movant Martin.

them and used any resulting damages recovered to repay Martin's creditors. The inconsistent position Martin asserts here gives him an unfair advantage over his creditors that is sufficient to satisfy the third factor of judicial estoppel. Van Horn, 812 F.3d at 1183; Moses v. Howard Univ. Hosp., 606 F.3d 789, 799 (D.C. Cir. 2010).

Judicial estoppel is not appropriate if Martin's failure to disclose his claims against Don was inadvertent or a mistake. Van Horn, 812 F.3d at 1183; Jones, 811 F.3d at 1034; South Dakota v. St. Cloud, 465 N.W.2d 177, 180 (S.D. 1991); see also Stallings, 447 F.3d at 1049 ("[J]udicial estoppel does not apply when a debtor's 'prior position was taken because of a good-faith mistake rather than as part of a scheme to mislead the court.'" (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996))). This exception generally applies if the "debtor does not have knowledge of [the] undisclosed claims or lacks a motive to conceal them." Van Horn, 812 F.3d at 1183; see also Jones, 811 F.3d at 1034.

Martin asserts that there "could be a number of reasons why" he failed to list his claims against Don, including that he "might not have yet determined" if he had such claims. Doc. 44 at 12. A debtor has knowledge of a cause of action if he is aware "of the facts giving rise to" it. U.S. ex rel. Long v. GSDMIdea City, LLC, 798 F.3d 265, 272 (5th Cir. 2015) (quoting Jethroe v. Omnova Sols., Inc., 412 F.3d 598, 601 (5th Cir. 2005)). "Bankruptcy law imposes [the duty to disclose] as long as the debtor has enough information to suggest that he may have a potential claim; the debtor need not know all of the underlying facts or even the legal basis of the claim." Id. (alteration in original) (quoting U.S. ex rel. Spicer v. Westbrook, 751 F.3d 354, 362 (5th Cir. 2014)); see also Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 784 (9th Cir. 2001) (explaining that judicial estoppel "will be imposed when the debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy").

Martin knew of the material facts giving rise to his claims when he filed for bankruptcy. The main thrust of Martin's complaint is that Don took LAA from him through misrepresentation, breach

14

of fiduciary duty, and deceit. Martin alleges that he failed to satisfy the conditions of the 2009 Agreement because he was relying on Don's promise to extend the December 15, 2009 deadline. Doc. 1 at ¶¶ 57–65, 79–83, 87, 89–94. He also claims that it was impossible for him to satisfy these conditions because Don ignored the offer Martin sent him and never provided Martin with the buyout price. Doc. 44 at 4; AUF at ¶¶ 36–40; Doc. 48 at ¶¶ 36–40; Doc. 46 at ¶ 16. But Martin would have been aware of these alleged facts and any damages resulting therefrom by the time Don filed the 2010 declaratory judgment action. Indeed, Martin advised that he was going to sue Don in June 2010. Moreover, Martin admitted in an affidavit that at the time of his bankruptcy petition, he told his bankruptcy attorney about the 2009 Agreement, the declaratory judgment action, "and the fact that I thought I could sue Don." Doc. 46 at ¶ 27. Martin knew that he had potential claims against Don when he filed for bankruptcy and should have disclosed those claims on his schedules.

Although Martin does not offer any evidence that he was unaware of his claims when he filed for bankruptcy, he did submit an affidavit listing seven "facts" he did not know at the time Don filed the declaratory judgment action.[9] Doc. 46 at ¶ 28. None of these facts save Martin's claims from judicial estoppel.

Martin first alleges that he did not know that "Don was treating the $75,000 obligation as fully paid, even though the payment was via an LAA distribution to Martin instead of a payment from RVHL." Doc. 46 at ¶ 28. Martin received the $75,000 payment in 2003. In April 2004, Don's accounting firm sent Martin his 2003 LAA Schedule K-1, which made clear that the $75,000 payment was a distribution to Martin from LAA rather than a payment separately by RVHL. Doc. 47-1. Martin thus knew or should have known about Don's treatment of the $75,000 payment for approximately seven years before he filed for bankruptcy.

---

[9]Martin submitted these "facts" in support of his argument that res judicata does not apply, but they will be addressed here in case Martin believes that these matters make application of the doctrine of judicial estoppel improper.

Second, Martin alleges that he did not know the "full extent of his tax liability stemming from Don's treatment of the transfer of Martin's interest in LAA to Don." Doc. 46 at ¶ 28. Martin knew that he had lost his interest in LAA by early 2010. Doc. 42-2 at 19; Doc. 47-3 at 2. Don sent Martin his 2009 Schedule K-1 for LAA in March 2010, and Martin's business associate signed for this package in early April. Doc. 40 at ¶¶ 73, 75; Doc. 43 at ¶¶ 73, 75. Martin's daughter delivered a package containing the K-1 and other financial information concerning LAA to Martin around the same time. Doc. 41 at ¶ 5; Doc. 40 at ¶ 80; Doc. 43 at ¶ 80; Doc. 42-1 at 27–34. Martin therefore had the information necessary to learn of his tax liability for nearly a year before filing for bankruptcy.

Third, Martin alleges that he did not know that "Don signed the 2006 Dacotah Bank mortgage by misrepresenting to the bank that he was in Arizona at the time of signing." Doc. 46 at ¶ 28. The only evidence Martin offers that Don made a misrepresentation to the bank is the notary block on the 2006 mortgage, which states that Martin and Don personally appeared before the notary in Arizona when the mortgage was signed. Presumably, the Arizona notary affixed his signature block to the mortgage when Martin signed the mortgage in Arizona. If so, Martin would have known that Don was not in Arizona when the mortgage was signed. Regardless, Don's location when the mortgage was signed and his supposed misrepresentation to the bank are not relevant to any of Martin's claims. Martin does not even mention these facts in his complaint, let alone explain how it damaged him or breached some duty owed to him for Don to sign the mortgage outside of Arizona.

Fourth, Martin alleges that he did not know that "Don had hired GRO to represent Don's [sic] personally instead of LAA." Doc. 46 at ¶ 28. Although GRO did work for LAA from time to time, GRO never represented Martin personally and Martin never had contact with GRO on LAA's behalf. Doc. 45-2 at ¶¶ 4, 7. The December 18, 2009 email from Linngren, which stated that Don had asked GRO to give Martin notice of his default, strongly suggested that GRO was representing Don rather than LAA. Doc. 42-2 at 49. The declaratory judgment complaint Don sent Martin in

March 2010 settled any doubts about who GRO was representing: the complaint was signed by Linngren and identified Don as the plaintiff and Martin as the defendant. Doc. 42-1 at 35–36. By the time he filed for bankruptcy, Martin knew that GRO had represented Don personally during the declaratory judgment action.

Fifth, Martin alleges that he did not know that "LAA paid Don's personal legal fees to GRO." Doc. 46 at ¶ 28. Don testified that it was possible that LAA, rather than Don himself, paid GRO for its work on the December 18, 2009 email and the declaratory judgment action. Doc. 45-1 at 22; AUF at ¶ 34; Doc. 48 at ¶ 34. Martin had no remaining interest in LAA when it possibly paid GRO for representing Don personally. Martin has represented that he lost his interest in LAA on December 15, 2009; under the terms of the 2009 Agreement, Martin's interest terminated by the end of December 2009 when his ten days to respond to Linngren's email expired. Doc. 42-9 at 9; Doc. 42-2 at 19, 45–46; Doc. 47-3 at 2. It is doubtful that GRO billed for work done in December until January, and thus doubtful that Don would have paid GRO through LAA until at earliest January of 2010, when Martin's interest in LAA was extinguished. Don hired GRO to represent him in the declaratory judgment action, which occurred months after December of 2009. But even if LAA had paid some of Don's legal fees during the final days of Martin's ownership in the company, Martin has not explained how this damaged him. For instance, Martin has not alleged that LAA's payment of Don's legal fees reduced Martin's distribution from LAA or prevented him from collecting some other benefit he expected from the company. Martin not knowing that LAA potentially paid Don's legal fees does not create a genuine issue of material fact.

Sixth, Martin alleges that he did not know that "Don kept Martin as a personal guarantor of the Dacotah Bank loans for years until Don refinanced with another bank." Doc. 46 at ¶ 28. Martin knew that he was a guarantor of the Dacotah bank loans because he signed the guaranty himself. Although Martin may not have known that he remained a guarantor for two or three years after his interest in LAA terminated, he has not explained how remaining as a guarantor caused him damage.

The bank did not look to Martin to pay any of LAA's loan. Martin's lack of knowledge of remaining a guarantor is not a material fact.

Seventh, Martin alleges that he did not know the "full extent of Don's conduct, elusiveness, and deception regarding Don's intentional avoidance of considering Martin's offers and not providing Martin with a payoff amount." Doc. 46 at ¶ 28. Martin does not identify any specific facts about Don's alleged misconduct that Martin was unaware of. Besides, as explained already, by the time Martin filed for bankruptcy he would have been fully aware that Don had not provided him with a buyout price, nor accepted the offer in the December 15, 2009 email, nor granted him an extension. Thus, although Martin may not have known all of the details surrounding the buyout price and offer, he knew of the material facts giving rise to his claims against Don for breaches of various duties, negligent misrepresentation, fraudulent inducement or deceit, unjust enrichment, and a constructive trust. Similarly, the Schedule K-1s and financial information for LAA that Martin received provided him with enough knowledge to know that he had potential claims against Don concerning Don's accounting and Martin's resulting tax liability. See GSDIdea City, 798 F.3d at 272; Hamilton, 270 F.3d at 784; Hay v. First Interstate Bank of Kalispell, 978 F.2d 555, 557 (9th Cir. 1992) ("We recognize that *all* facts were not known to Desert Mountain at that time, but enough was known to require notification of the existence of the asset to the bankruptcy court.").

Although Martin does not argue that he lacked a motive to conceal his claims, he does contend that he relied on the advice of his bankruptcy attorney when filling out his bankruptcy schedules. Doc. 46 at ¶ 27; Doc. 43 at ¶ 89. Martin's affidavit states: "At the time of my bankruptcy petition, I fully disclosed the relationship between Don and I, the 2009 Agreement and declaratory judgment, and the fact that I thought I could sue Don. My bankruptcy lawyer took the information I gave him and filled out the schedules for me to review and sign, which I did using his advice." Doc. 46 at ¶ 27. Without any additional evidence of mistake or inadvertence, Martin's statement that he disclosed the potential suit to his bankruptcy attorney and relied on his attorney's advice does not

18

create a genuine issue of material fact. Courts routinely hold that reliance on an attorney's advice does not except a claim from judicial estoppel. See Eastman, 493 F.3d at 1157, 1159 (holding that debtor's assertion that he had told his attorney about claims and that his attorney "blew it" was "insufficient to withstand application of" judicial estoppel); Cannon-Stokes v. Potter, 453 F.3d 446, 448–49 (7th Cir. 2006) (applying judicial estoppel despite debtor's affidavit stating that her bankruptcy attorney had advised her to omit a discrimination claim from her schedules); Barger v. City of Cartersville, 348 F.3d 1289, 1295 (11th Cir. 2003) ("Although it is undisputed that [the debtor's] attorney failed to list [the debtor's] suit on the schedule of assets despite the fact that [the debtor] specifically told him about the suit, the attorney's omission is no panacea."); Cover v. J.C. Penney Corp., 187 F. Supp. 3d 1079, 1089 (D. Minn. 2016) (holding that debtor's affidavit saying that she disclosed claim to bankruptcy attorney and relied on his advice did not prevent summary judgment because "[r]eliance on legal advice does not constitute a good faith mistake for purposes of judicial estoppel"). Regardless of what Martin's bankruptcy attorney told him, it was Martin himself who signed the bankruptcy petition and represented that the information therein was true and correct. Doc. 42-8 at 4; Cannon-Stokes, 453 F.3d at 449.

The Eighth Circuit has cautioned that the "requisite intent for judicial estoppel" should not "be inferred from the mere fact of nondisclosure in a bankruptcy proceeding." Stallings, 447 F.3d at 1049 (quoting Ryan Operations G.P., 81 F.3d at 364). Courts have inferred the requisite intent, however, when the debtor knew of the claim and had a motive for concealing it. Eastman, 493 F.3d at 1157; Barger, 348 F.3d at 1294; In re Coastal Plains, 179 F.3d at 212–213; Ryan Operations G.P., 81 F.3d at 363. As explained above, Martin knew of his claims against Don at the time he filed for bankruptcy. He also had a clear motive to conceal them: if the claims became part of the bankruptcy estate then the proceeds would go towards paying his creditors rather than to Martin himself. See De Leon v. Comcar Indus., 321 F.3d 1289, 1291 (11th Cir. 2003) (per curiam) ("[A] financial motive to secret assets exists under Chapter 13 as well as under Chapter 7 because the hiding of assets affects

the amount to be discounted and repaid."); Azuike v. BNY Mellon, 962 F. Supp. 2d 591, 600 (S.D.N.Y. 2013) (finding that a Chapter 7 debtor had a motive to conceal claim because otherwise the trustee could sell the claim or settle it for the benefit of the debtor's creditors); Bone v. Taco Bell of Am., LLC, 956 F. Supp. 2d 872, 883 (W.D. Tenn. 2013) ("A person petitioning for Chapter 7 bankruptcy protection presumably has 'a motive to conceal [civil] claims: wanting to keep any settlement or judgment to himself.'" (alteration in original) (quoting Stephenson v. Malloy, 700 F.3d 265, 274 (6th Cir. 2012))). Moreover, the timing of Martin's suit against Don suggests that his failure to disclose his claims was not inadvertent or a mistake. Martin obviously needed money when he filed for bankruptcy. He also knew that his creditors might see LAA as an avenue for recovering the money he owed them; when LAA was raised in the adversary proceeding, Martin denied having any interest in the company. Nevertheless, Martin waited until after he received his discharge in bankruptcy to bring this suit, an asset that he claims to be worth over $1.5 million. The record supports an inference that Martin acted intentionally.

In sum, equitable considerations justify applying judicial estoppel. Martin promised that unless he met the four conditions in the 2009 Agreement by December 15, 2009, he would forfeit LAA to Don. When Martin failed to meet these conditions, Linngren sent an email giving Martin a chance to object to the transfer of his interest in LAA. Martin never responded. Thereafter, Don brought a declaratory judgment action to determine the parties' rights to LAA. Martin could have appeared in that action and raised many of the same claims he raises now. In fact, when the declaratory judgment action was still pending, Martin called Don's office and said he was going to sue him. For whatever reason, however, Martin ultimately chose to ignore Don's suit. The state court entered a default judgment against Martin confirming that Don had complete ownership of LAA. When Martin filed for bankruptcy less than a year later, he was aware of the facts giving rise to the claims he asserts now. Yet he represented to the bankruptcy court that no such claims existed, despite having a duty to disclose all of his assets. The bankruptcy court accepted Martin's position

that he had no claims against Don and discharged $1,866,649.08 of Martin's debt. Now that Martin is free and clear of his creditors, he takes the position in this Court that he does, in fact, have claims against Don and that these claims are worth over $1.5 million. The only reasonable inference that can be drawn from these facts is that Martin intended to conceal his claims so that he could keep any potential recovery for himself. Martin's arguments concerning mistake and inadvertence are not enough to create a genuine issue of material fact. Don is entitled to judgment as a matter of law.

## IV.   Conclusion

For the reasons explained above, it is hereby

ORDERED that Defendant's Motion for Summary Judgment, Doc. 38, is granted.

DATED this ___25th___ day of September, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE